# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| ALEKSANDR UZUN,<br><br>        Plaintiff,<br><br>   -against-<br><br>ARRIS INTERNATIONAL, PLC, ANDREW W. BARRON, J. TIMOTHY BRYAN, JAMES A. CHIDDIX, ANDREW T. HELLER, JEONG KIM, BRUCE MCCLELLAND, BARTON Y. SHIGEMURA, ROBERT J. STANZIONE, DOREEN A. TOBEN, DEBORA J. WILSON, and DAVID A. WOODLE,<br><br>        Defendants. | Case No.  18-CV-05555-WMR |
| LOUISE AGNES-SAMPSON, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>   -against-<br><br>ARRIS INTERNATIONAL, PLC, ROBERT J. STANZIONE, BRUCE MCCLELLAND, ANDREW W. BARRON, J. TIMOTHY BRYAN, JAMES A. CHIDDIX, ANDREW T. HELLER, JEONG KIM, BARTON Y. SHIGEMURA, DOREEN A. TOBEN, DEBORA J. WILSON, and DAVID A. WOODLE,<br><br>        Defendants. | Case No.  19-cv-00243-WMR |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF SETTLEMENT, FINAL
CERTIFICATION OF SETTLEMENT CLASS, AND
<u>APPROVAL OF AWARD OF ATTORNEYS' FEES AND EXPENSES</u>**

## INTRODUCTION

On January 9, 2020, the Court preliminarily approved the settlement of claims brought by Plaintiffs[1] in the above-captioned actions (the "Actions") and preliminarily certified a non-opt-out class of ARRIS stockholders in connection with the settlement. Now, Plaintiffs seek final certification of the class, approval of Plaintiffs as class representatives and Plaintiffs' Counsel as class counsel, and final approval of the settlement based on terms outlined in the MOU dated January 18, 2019, and, after completing discovery, memorialized in the Stipulation dated December 4, 2019. *See* Exhibit 1 to Declaration of Elizabeth K. Tripodi ("Decl.). Additionally, Plaintiffs request approval of an award for Class Counsel attorneys' fees and expenses to compensate for their efforts in the aggregate amount of $437,500, as agreed to by the parties in the Stipulation (the "Fee and Expense Award").

For the reasons set forth below, the Court should grant all the requested relief and finally approve the Settlement, which is fair, reasonable and adequate.

## ARGUMENT

### I.     THE APPLICABLE LEGAL STANDARD

There is a "strong judicial policy favoring settlement." *Bennett v. Behring*

---

[1] Unless otherwise defined, capitalized terms have the same meaning set forth in Plaintiffs' Brief in Support of Preliminary Approval (*Uzun* Doc. No. 7).

1

*Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). In evaluating whether a class action settlement warrants final approval, the Court must consider the factors listed in Rule 23(e)(2), including whether "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account:  (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2); *In re Equifax Inc. Customer Data Security Breach Litig.*, 2020 WL 256132, at \*5 (N.D. Ga. Jan. 13, 2020). In addition to these factors, the Court may consider the factors set forth in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984), including:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Id.* at 986.  These factors are consistent with Rule 23(e)(2).

## II.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A. The Settlement Was Negotiated at Arm's Length

"In determining whether there was fraud or collusion, the court examines whether the settlement was achieved in good faith through arms-length negotiations, whether it was the product of collusion between the parties and/or their attorneys, and whether there was any evidence of unethical behavior or want of skill or lack of zeal on the part of class counsel." *Canupp v. Sheldon*, 2009 WL 4042928, at *9 (M.D. Fla. Nov. 23, 2009).

Here, the consideration for the Settlement—the Supplemental Disclosures— was procured after adversarial proceedings and negotiations took place to resolve the motions for preliminary injunction and expedited proceedings in the *Agnes-Sampson* Action and the demand letters sent in the *Uzun* Action. Class Counsel zealously advocated for and negotiated with Defendants to make the Supplemental Disclosures to moot the injunction motion and the litigation. Furthermore, the negotiation of the Fee and Expense Award was adversarial and protracted, and was negotiated at arms-length following the close of the Transaction after the parties had procured the relief for the Class.

### B. The Settlement Provides Ample Relief

3

Rule 23(e)(2) weighs the relief provided for the class, taking into account "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C).

### 1.  The Benefits Achieved

Before moving on to these factors under Rule 23(e)(2), it is important to note the actual benefit obtained through the Settlement. Here, Plaintiffs achieved the exact relief they sought when filing the Actions – the disclosure of material information that had previously been kept from the Company's stockholders.

Section 14(a) obligated Defendants to fully and fairly disclose all material information when soliciting stockholder action. *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) ("The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation. The section stemmed from the congressional belief that fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange."). However, the Proxy soliciting ARRIS stockholders to vote in favor of the Transaction contained material

misrepresentations and/or omissions. Most significantly, the Defendants omitted—and the Supplemental Disclosures provided—the unlevered free cash flows from the summary of ARRIS' projections, which is the most significant financial metric a shareholder must have when confronted with whether to accept a one-time cash payment in exchange for foregoing future profits from the corporation. *See Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1178 (Del. Ch. 2010) (explaining that "under sound corporate finance theory, the value of stock should be premised on the expected future cash flows of the corporation," and enjoining vote until free cash flow projections were disclosed).

A company's financial projections are "among the most highly-prized disclosures by investors" facing a merger decision, because a company's management and financial advisors have "meaningful insight into their firms' futures that the market [does] not." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. 2007); *accord Azar v. Blount Int'l, Inc*., 2017 U.S. Dist. LEXIS 39493, at *16 (D. Or. Mar. 20, 2017) ("The established case law shows the importance (and, hence, materiality) of financial projections to shareholders' decision-making"). And free cash flow projections, like those included in the Supplemental Disclosures, are the most highly prized projections shareholders seek when valuing a company for a merger transaction. *See, e.g., Maric*, 11 A.3d at 1178

(granting injunction for failure to disclose unlevered free cash flows in the proxy in connection with merger); *Karp v. First Conn. Bancorp, Inc.*, 2019 U.S. Dist. LEXIS 162819, at *17 (D. Md. Sep. 24, 2019) (denying motion to dismiss Section 14(a) claim based on the omission of unlevered free cash flows); *United States v. Smith*, 155 F.3d 1051, 1064 n.20 (9th Cir. 1998) ("After all, investors are concerned, perhaps above all else, with the future cash flows of the companies in which they invest"); *Nichting v. DPL Inc.*, 2011 U.S. Dist. LEXIS 76739, at *17 n.16 (S.D. Ohio July 15, 2011) (finding "it smacks of materiality that a voter be made aware of the Company's cash flow projections in order to make an informed decision").

The disclosure of EBITDA projections, absent unlevered free cash flow projections—like the summary provided in the Proxy—presents a misleading valuation picture of a company. This is due to the fundamental differences between unlevered free cash flow and EBITDA.[2] EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value. Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/. As a result of these material differences between EBITDA and unlevered free cash flows, experts recognize

---

[2] *See, e.g.*, Elizabeth MacDonald, *The EBITDA Folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company. *See id*. ("[EBITDA] does not exist in a vacuum and is irrelevant on a standalone basis…[It] is by no means a thorough valuation tool when making an important investment decision").

A misleading presentation of EBITDA without disclosing the crucial cash flow projections was the precise situation here, which was cured through the Supplemental Disclosures, as illustrated by the chart below:

1.   The section of the Proxy Statement entitled "The Acquisition—Certain Financial Projections" is hereby supplemented as follows:

*The table on page 46 of the Proxy Statement is amended and restated to read as follows:*

|  | 2019E | 2020E | 2021E |
|---|---|---|---|
| Sales | $7,109 | $7,311 | $7,554 |
| Gross Margin | $2,123 | $2,236 | $2,386 |
| *Gross Margin %* | *29.9%* | *30.6%* | *31.6%* |
| Operating Expenses[1] | $1,382 | $1,416 | $1,475 |
| *% of Revenue* | *19.4%* | *19.4%* | *19.5%* |
| DOI[2] | $741 | $820 | $911 |
| *Margin %* | *10.4%* | *11.2%* | *12.1%* |
| Non-GAAP EBITDA[3] | $928 | $1,015 | $1,108 |
| *Margin %* | *13.1%* | *13.9%* | *14.7%* |
| Adjusted EPS[4] | $3.60 | $4.27 | $5.10 |
| Diluted Shares | 173.0 | 162.0 | 151.0 |
| Unlevered Free Cash Flow[5] | $681 | $664 | $734 |

Decl. Exh. 1-A. at 3. As shown, the unlevered free cash flow projections indicate a projected decline in the Company's cash flows for 2020 that was previously undetectable to ARRIS shareholders. The original disclosures provide no indication of this downturn, as the closest metric, Non-GAAP EBITDA, was projected to increase in *both* 2020 and 2021. But because the Company's financial advisor conducted a discounted cash flow analysis that utilized unlevered free cash flows

rather than Non-GAAP EBITDA, the range of fair values generated for the Company assumed a decrease in performance in 2020, rather than an increase. Stockholders had no inkling of this material fact until the Supplemental Disclosures revealed it.

By omitting the Company's unlevered free cash flows, the Proxy had materially misled ARRIS stockholders regarding the most significant metric in a discounted cash flow analysis. As testified to by Defendants McClelland and Potts, these cash flows were integral to the discounted cash flow analysis conducted by the Company's financial advisor. Decl. ¶ 2.

Accordingly, by securing the disclosure of this material information, Plaintiffs achieved the precise results demanded in their Complaints and assured the fully informed vote that would have been impossible had Plaintiffs not secured this information through the Settlement. *See Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*, 2014 U.S. Dist. LEXIS 156227, at *50 (C.D. Cal. Nov. 4, 2014) ("An uninformed shareholder vote is often considered an irreparable harm, particularly because the *raison d'etre* of many of the securities laws is to ensure that shareholders make informed decisions"); *Mony Grp, Inc. v. Highfields Capital Mgmt., L.P.*, 368 F.3d 138, 148 (2d Cir. 2004) ("In passing Section 14(a), Congress sought to avoid a very particular harm--the solicitation of shareholder proxies

8

without adequate disclosure."). In other words, Plaintiffs "provide[d] a necessary supplement to Commission action[,]" which was the very reason the Supreme Court held stockholders have a private right of action under Section 14(a). *Borak*, 377 U.S. at 432.

## 2. Costs, Risks, and Delay of Continued Litigation

Like other factors, this one seeks to measure whether a settlement is reasonable in light of known or perceived risks. *See, e.g., UAW*, 497 F.3d at 631 (although a court is not required to "decide the merits of the case or resolve unsettled legal questions," it cannot "judge the fairness of a proposed compromise" without "weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement") (citation and internal quotations omitted).

Where there are material deficiencies in disclosure documents seeking stockholder approval, courts have held that the preferred remedy is disclosure *before* the merger. *See Koppel v. 4987 Corp.*, 167 F.3d 125, 137 (2d Cir. 1999) ("[W]e do have a strong preference for an injunctive remedy over damages for violations of the proxy rules"). The material information Plaintiffs obtained for ARRIS stockholders *prior* to the stockholder vote preserved stockholders' invaluable corporate suffrage rights, rights that cannot be restored through monetary

damages. *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1149-50 (D. Kan. 2001); *St. Louis Police Ret. Sys. v. Severson*, 2012 WL 5270125, at \*6 (N.D. Cal. Oct. 23, 2012) ("[D]isclosure deficiencies cannot be remedied effectively by an after-the-fact damages case") (internal quotation marks omitted). In this case, Plaintiffs ensured that ARRIS stockholders received the Supplemental Disclosures well in advance of the vote, thereby providing ARRIS stockholders enough time to absorb and consider the information and make an informed decision regarding the Transaction.

Furthermore, had Defendants not caused the Company to issue the Supplemental Disclosures, palpable risk existed that the Court would have enjoined the stockholder vote. *See Maric*, 11 A.3d at 1178 (enjoining vote until cash flows were disclosed); *Netsmart*, 924 A.2d at 203 (same). Enjoining a stockholder vote on a transaction always presents the possibility that the buyer could walk away, thus denying stockholders the opportunity to decide for themselves whether to vote in favor of a transaction. Securing this highly material information for the stockholders of ARRIS conferred upon them a substantial benefit and did so without the deal risk that enjoining the vote on the merger might have presented.

As noted above, because the Supplemental Disclosures were issued before the stockholder vote on the merger, there was no longer any basis for continuing the

10

litigation. Nevertheless, if Defendants had refused to moot the action by issuing the Supplemental Disclosures and the litigation had continued, Plaintiffs would have faced significant hurdles in attempting to obtain damages. Specifically, Plaintiffs would have faced a strong argument that they could not establish loss causation, which requires "connect[ing] the proxy misstatements with an actual economic harm." *N.Y.C. Emples.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1023 (9th Cir. 2010). Indeed, proof of economic harm in actions such as this frequently boils down to a battle of experts regarding the financial fairness of the merger, and, the recent trend is for courts to conclude that the merger price was fair. *See Verition Partners Master Fund, Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 135 (Del. 2019) ("[W]hen a public company with a deep trading market is sold at a substantial premium to the preannouncement price, after a process in which interested buyers all had a fair and viable opportunity to bid, the deal price is a strong indicator of fair value, as a matter of economic reality and theory").

Simply put, Plaintiffs faced an uphill battle in establishing loss causation if they had been unable to procure the Supplemental Disclosures and this litigation continued. Fortunately, Plaintiffs were able to force Defendants to issue the Supplemental Disclosures so that stockholders could cast a fully-informed vote regarding the Transaction, precisely as Congress intended when it enacted Section

14(a). *Borak*, 377 U.S. at 431. The foregoing considerations demonstrate that the Supplemental Disclosures provided the Class with fair consideration. Indeed, such disclosures were both the preferred form of consideration in a Section 14(a) action and likely the only form of relief that the Class could obtain. If Defendants had refused to make the Supplemental Disclosures and this litigation continued after the merger closed, ARRIS stockholders would have faced significant hurdles in connecting the proxy misstatements with an actual economic harm and obtaining damages. As a result, analysis of this factor supports final approval of the Settlement.

### 3.  The Method of Distributing Relief is Effective

Rule 23(e)(2)(C)(ii) requires the Court to consider the effectiveness of the distribution of relief to the class. *See Equifax*, 2020 WL 256132, at *8. Filing the Supplemental Disclosures with the SEC on a Form 8-K, for publication in the same method as all other Company filings, was clearly effective and provided the best opportunity for all members of the class and public to receive the additional information provided by Defendants as consideration for the Settlement.

### 4.  The Terms Relating to Attorneys' Fees are Reasonable

The third consideration of evaluating relief under Rule 23(e)(2)(C) is whether the attorneys' fees requested are reasonable. Fed. R. Civ. P. 23(e)(2)(C)(iii). As

argued in Part VI, *infra*, the attorneys' fees agreed to by the parties are reasonable under prevailing precedent and the facts of the case, and were negotiated at arm's-length following the issuance of the Supplemental Disclosures, thus having no effect on the consideration provided to the Class.

### 5. The Agreements Required to Be Identified By Fed. R. Civ. P. 23(e)(3)

Rule 23(e)(3) requires that the parties file a statement identifying agreements made in connection with the proposed settlement. The parties have provided the Court with the only agreements entered into in connection with the settlement, the MOU and the Stipulation, in satisfaction with Rule 23(e)(3).

### C. Class Members are Treated Equitably Relative to Each Other

The fourth and final factor to evaluate under Rule 23(e)(2) is whether the class members are treated equitably to each other. Fed. R. Civ. P. 23(e)(2)(D); *Equifax*, 2020 WL 256132, at *9. The advisory committee for the latest revision to the Federal Rules of Civil Procedure notes that this factor is closely related to the adequacy requirement of Rule 23(a), which was thoroughly addressed in Plaintiffs' Brief in Support of Preliminary Approval (*Uzun* Doc. No. 7). Here, where all holders of ARRIS stock received the same consideration –the Supplemental Disclosures –no individual or group of stockholders will receive an outsize benefit compared to others.

13

### D. The *Bennett* Factors Support Approving the Settlement

In addition to those factors required under Rule 23(e)(2), the *Bennett* factors also support final approval of the settlement: (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the anticipated complexity, expense, and duration of litigation; (5) the opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *Equifax*, 2020 WL 256132, at *10. Many of the *Bennett* factors overlap with those found in Rule 23(e)(2).

The first and fourth *Bennett* factors strongly support approving the Settlement. The likelihood of success at trial was uncertain at best, as following the Transaction, Plaintiffs would have needed to prove damages in addition to the materiality of the alleged omissions. Defendants would have raised defenses at the motion to dismiss and summary judgment stage and the Settlement provides relief that may not have been available had the case been tried, or even allowed to go unresolved though the stockholder vote. The case would have been extraordinarily expensive to litigate going forward and would have certainly taken years to conclude.

Likewise, consideration of the second and third *Bennett* factors support the Settlement as fair, reasonable, and adequate because the Settlement provided

14

exactly the relief sought by Plaintiffs in their pleadings. Thus, because it provided the very relief sought by this Action, this factor favors approval of the Settlement.

As for the fifth *Bennett* factor, although the reaction of a class to a settlement should be considered, "the existence of objections does not mean that the settlement is unfair." *In re Telectronics*, 137 F. Supp. 2d at 1018; *see Bailey*, 2008 U.S. Dist. LEXIS 16704, at *12 (same). Indeed, even if a majority of the class were opposed to a settlement, this would still not "serve as an automatic bar to a settlement," as long as a "district judge, after weighing all the strengths and weaknesses of a case and the risk of litigation, determines [the settlement] to be manifestly reasonable." *In re Telectronics*, 137 F. Supp. 2d at 1018 (citation and internal quotations omitted); *see Bailey*, 2008 U.S. Dist. LEXIS 16704, at *12 (same).

Here, Notice was disseminated in the manner approved by the Court. The deadline for filing objections to the settlement agreement is April 1, 2020. Class Counsel notes that to date, no objections have been received. Decl. ¶ 3.

With respect to the stage of the proceedings, the purpose of this factor is "to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005). Class Counsel have thoroughly evaluated and investigated the facts and law, and

conducted substantial discovery, including the review of the documents central to the Transaction and the deposition of ARRIS' CEO and CFO. Class Counsel were "well informed as to the operative facts" and "considerable risks" of the Action. *See Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006).

Class Counsel have significant experience in securities and other complex class action litigation. Courts recognize that the opinion of experienced and informed counsel supporting a proposed settlement is entitled to considerable weight. *Lipuma*, 406 F. Supp. 2d at 1318-19. It is Plaintiffs' and Class Counsel's informed opinion that, given the uncertainty and further substantial expense of pursuing the Actions against Defendants through trial and possible appeals, the proposed Settlement is fair, reasonable and adequate, and in the best interests of the Class and warrants final approval.

## III.   THE CONDITIONALLY CERTIFIED CLASS SHOULD BE CERTIFIED

The Court's Preliminary Approval Order preliminarily certified the Settlement Class. Since that time, nothing has occurred indicating that the Settlement Class does not meet the requirements of Rules 23(a), 23(b)(1), and (b)(2) of the Federal Rules of Civil Procedure. Accordingly, the Court should finally certify the Settlement Class. For the sake of brevity, Plaintiffs incorporate by

reference the arguments from their Brief in Support of Preliminary Approval regarding the propriety of class certification. *See Uzun* Doc. No. 7 at 17-23.

## IV.  THE COURT SHOULD APPROVE THE FEE AND EXPENSE AWARD TO CLASS COUNSEL

Pursuant to the Stipulation, Defendants agreed not to oppose the requested Fee and Expense Award, which will "be paid by ARRIS or its successor and/or their insurer(s) and/or the insurer(s) of the Individual Defendants[.]" Stipulation ¶ 12(a).  Thus, the requested amount of the Fee and Expense Award represents "a cap on the attorney's fees"—Plaintiffs' Counsel agreed not to seek a higher amount, and Defendants' "promise[d] not to contest the amount of attorney's fees so long as it falls beneath a negotiated cap." *In re Home Depot, Inc., Customer Data Sec. Breach Litig.*, 931 F.3d 1065, 1081 n.14 (11th Cir. 2019) (explaining "[u]sually, when courts have applied the constructive common-fund doctrine, the parties at least agreed to a cap on the attorney's fees"). As indicated above, the requested Fee and Expense Award does not impact the benefit already conferred on the Settlement Class in the form of the Supplemental Disclosures, and was negotiated at arm's-length with Defendants, who were incentivized to agree to the lowest reasonable fee.

17

The requested Fee and Expense Award is supported by ample authority. In *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 396 (1970), the Supreme Court held that vindicating Section 14(a)'s statutory policy of "informed corporate suffrage" confers a substantial benefit upon shareholders sufficient to warrant awarding attorney's fees. As the Supreme Court explained:

> In many suits under § 14 (a) . . . it may be impossible to assign monetary value to the benefit. Nevertheless, the stress placed by Congress on the importance of fair and informed corporate suffrage leads to the conclusion that, in vindicating the statutory policy, petitioners have rendered a substantial service to the corporation and its shareholders . . . . [P]rivate stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders by providing an important means of enforcement of the proxy statute.

*Id*.

Since *Mills*, it has become "well established that non-monetary benefits, such as promoting fair and informed corporate suffrage . . . may support a fee award." *Koppel v. Wien*, 743 F.2d 129, 134 (2d Cir. 1984). "[T]he promotion of corporate suffrage regarding a significant policy issue confers a substantial benefit regardless of the percentage of votes cast for or against the proposal at issue." *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores*, 54 F.3d 69, 72 (2d Cir. 1995); *Kopet v. Esquire Realty Co.*, 523 F.2d 1005, 1008 (2d Cir. 1975) (awarding fee where litigation caused company to disclose financial statements).

18

While courts calculate fees as a percentage of a fund in common fund cases, and under a lodestar analysis in statutory fee-shifting cases, there is no prescribed method for the calculation of reasonable fees under a settlement agreement where the maximum amount of attorney's fees have been agreed upon but no common fund exists. *Home Depot*, 931 F.3d at 1081-82. In such a case, the Court has discretion in its methodology. And, as set forth below, an established body of precedent for determining the value of supplemental disclosures and commensurate attorneys' fees exists and should guide the Court here.

Under the lodestar method, the starting figure is arrived at by multiplying the number of hours Plaintiffs' Counsel expended on the litigation by a reasonable hourly rate. *Home Depot*, 931 F.3d at 1076. As set forth in the supporting declarations, Plaintiffs' Counsel spent 536.85 hours prosecuting these Actions[3] and applying Plaintiffs' Counsel's standard hourly rates,[4] the lodestar is $374,659.50.

---

[3] Courts have recognized that where, as here, a settlement "provided plaintiff's counsel the opportunity to scrutinize the merits of the transaction through discovery of internal and confidential information not available to the public and through direct examination of the individuals who assessed the transaction", the fact that "the merits of the proposed merger have been independently vetted" also provides a "meaningful" benefit to shareholders. *Brody v. Catell*, 2007 N.Y. Misc. LEXIS 4647, at *13, 22 (N.Y. Sup. Ct. 2007).

[4] "In determining a reasonable hourly rate, the relevant legal community here is the "nationwide" "market for class action attorneys", which "is populated by very experienced attorneys with excellent credentials[.]" *In re Microstrategy, Inc.*, 172

Decl. Exhs. 2-4. Plaintiffs' Counsel also incurred $3,044.75 in expenses in prosecuting the Actions. *Id*.

Thus, the requested Fee and Expense Award represents a modest 1.16 multiplier to Plaintiffs' Counsel's lodestar, and is reasonable given other factors typically evaluated in awarding attorneys' fees. *See, e.g., Thompson v. State Farm Fire & Cas. Co.*, 2019 U.S. Dist. LEXIS 6137, at *29 (M.D. Ga. Jan. 14, 2019) (citing cases noting "a multiplier of 2.5 on plaintiff's counsel's lodestar was reasonable"). In particular, the risk undertaken by Plaintiffs' Counsel in representing Plaintiffs and the Class on an entirely contingent basis justifies a reasonable lodestar multiplier. As the Seventh Circuit explained:

> Here the district court erred in basing its denial of a risk multiplier on the fact that the parties settled at a relatively early stage in the litigation. The point at

F. Supp. 2d 778, 788-788 n.33 (E.D. Va. 2001). Here, Plaintiffs' Counsel's rates are in line with those of other nationally recognized securities class action attorneys. *See, e.g., NLJ's Billing* Survey, 37 Nat. L.J. 7 (Jan. 5, 2015) (demonstrating average hourly rates in line with Class Counsel) (Decl. Exh. 5); *Spencer v. Comserv Corp.*, 1986 U.S. Dist. LEXIS 15863, at *32-33 (D. Minn. Dec. 30, 1986) ("Compensating a nationally recognized securities class action attorney at his hourly rate is entirely appropriate"); *In re Enron Corp. Sec.*, 586 F. Supp. 2d 732, 790 (S.D. Tex. 2008) (indicating "an upward adjustment" is appropriate "if the local customary fees were substantially lower than the fee [the class lawyer] easily commands in the securities market nationally"). Plaintiffs' Counsels' hourly rates are also undoubtedly in line with or less than the rates charged by Defendants' counsel, which is a relevant consideration. *See Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 n.18 (7th Cir. 1982) ("The rates charged by the defendant's attorneys provide a useful guide to rates customarily charged in this type of case").

> which plaintiffs settle with defendants (or win a judgment against defendants) is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them . . . . when attorneys' receipt of payment is contingent on the success of the litigation, reasonable compensation may demand more than the hourly rate multiplied by the hours worked, for that is exactly what the attorneys would have earned from clients who agreed to pay for services regardless of success.

*Skelton v. General Motors Corp.*, 860 F.2d 250, 257-58 (7th Cir. 1988). Numerous other courts have agreed. *E.g., McKittrick v. Gardner*, 378 F.2d 872, 875 (4th Cir. 1967) ("Charges on the basis of a minimal hourly rate are surely inappropriate for a lawyer who has performed creditably when payment of any fee is so uncertain"); *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 665 (E.D. Va. 2001) ("[T]o reward lead counsel for the favorable result achieved for the class and to provide an incentive for competent lawyers to pursue such actions in the future on an essentially contingent basis, the ultimate award must be substantially greater than the lodestar figure"); *In re Schering-Plough/Merck Merger Litig.*, 2010 U.S. Dist. LEXIS 29121, at *55-58 (D.N.J. Mar. 25, 2010) (applying 2.18 multiplier in disclosure settlement and noting a multiplier of 3 may be awarded even in "a simple case where no risks pertaining to liability or collection were pertinent").

As the Eleventh Circuit explained in *Home Depot*, the propriety of a multiplier turns on whether the case at issue is properly characterized as a fee-shifting case or a common-fund case. 931 F.3d at 1085 ("[I]t makes sense to draw a

21

clear line between fee-shifting cases and common-fund cases."). While risk is "not an appropriate basis for enhancing an attorney's fee in statutory fee-shifting cases" or "contractual fee-shifting cases[,]" *id.* at 1084-86, this action is more akin to a common fund action. Indeed, the purpose of the common benefit doctrine, like the common fund doctrine, is to "prevent[] unjust enrichment[.]" *Id.* at 1085; *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991) (explaining "the common fund derives from the equitable power of the courts under the doctrines of quantum meruit, unjust enrichment, and later, what has become known as the 'substantial' or 'common benefit' doctrine"). Indeed, as the Eleventh Circuit has explained: "*Mills* teach[es] that the purpose of the common benefit doctrine is to spread the cost of the litigation, including attorney's fees, among those who have benefitted from the litigation. *It is not so much fee-shifting as fee-spreading*." *Smith v. GTE Corp.*, 236 F.3d 1292, 1307 (11th Cir. 2001) (emphasis added). In cases such as this, the "fee-spreading is accomplished" "by assessing costs against the defendant corporation directly, because those costs are, in effect, incurred by the shareholder/beneficiaries." *Id*. Here, the ARRIS shareholders who benefited from the Supplemental Disclosures "had pre-existing relationships with the corporation" and thus "contributed funds to the treasury from which the fee award" will come. *United States v. Imperial Irrigation Dist.*, 595 F.2d 525, 531 (9th Cir. 1979).

Because this action is more akin to a common-fund case than a fee-shifting case, a risk multiplier is not prohibited by *Home Depot*, and is warranted in light of the above-cited authority. Indeed, the requested Fee and Expense Award is well within the range awarded in similar cases and based on similar hourly rates as here, where the settlement consideration consisted of financial supplemental disclosures. As explained above, projections, and in particular free cash flows, are very important for shareholders. For example, in *Nichting* the Court stated "it smacks of materiality that a voter be made aware of the Company's cash flow projections in order to make an informed decision." *Nitching v. DPL Inc.*, 2011 U.S. Dist. LEXIS 76739, at *17 n.16 (S.D. Ohio July 15, 2011). The *Nitching* Court went on to award $700,000 in attorneys' fees (representing hourly rates for lead counsel from $475 (associates) to $750 (partners) and expenses as part of settlement that obtained disclosure of unlevered free cash flows in proxy for the merger (same relief obtained here). *Nichting v. DPL Inc.*, No. 3:11-cv-141, Order and Final J. 7 (S.D. Ohio Feb. 24, 2012) (Decl. Exh. 6); *In re Crestwood Midstream Partners Unitholder Litig.*, No. 4:13-cv-01528, Order and Final J. at 7-8 (S.D. Tex. May 16, 2014) (approving $595,000 fee representing hourly rates for lead counsel from $360 (associates) to $875 (partners) and an expense reward for projection line items) (Decl. Exh. 7); *Lambert v. Tellabs, Inc.*, No. 13-cv-07945, Final Order and J. (N.D.

Ill. Sept. 11, 2015) ($700,000 fee (representing hourly rates for lead counsel from $375 (associates) to $950 (partners) and $50,000 in expenses for supplemental disclosures of multiples used by financial advisor to support its fairness opinion) (Decl. Exh. 8); *Rice v. Genworth Financial Incorporated*, 3:17-cv-00059-REP (E.D. Va. June 1, 2018) (approving $625,000 fee (representing hourly rates for Lead Counsel from $375 (associates) to $895 (partners) and expense award for financial supplemental disclosures in connection with merger) (Decl. Exh. 9).

And, in cases settled for nonmonetary benefits like supplemental disclosures, the Delaware Court of Chancery has also determined appropriate fee awards by "evaluat[ing] the qualitative importance of the disclosures obtained" and "juxtaposing the case before it with cases in which attorneys have achieved approximately the same benefits." *In re Del Monte Foods Co. S'holders Litig.*, 2011 Del. Ch. LEXIS 94, at *27 (Del. Ch. June 27, 2011) (internal citations and quotations marks omitted). Applying that methodology, courts have "often awarded fees of approximately $400,000 to $500,000 for one or two meaningful disclosures" such as the type obtained here—"previously withheld projections[.]" *Id*. When confronted with the same omission remedied as here of unlevered free cash flows or projections, it has awarded higher or similar fees as the one requested here. *Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1178 (Del. Ch.

24

2010) (stating that sound corporate finance theory bases value upon expected future cash flows of the corporation, and, thus, shareholders voting on a merger are entitled to make their decisions based on those cash flows, and subsequently awarding a Plaintiffs' counsel with a fee award in the amount of $750,000); *Hamil v. Ambry Genetics Corp.*, Case Number 2017-0587 (Del. Ch. 2019) (awarding $450,000 for disclosure of projections) (Decl. Exh. 10).

Furthermore, this is consistent with the Eleventh Circuit noting that a settlement may be supported by "non-monetary benefits conferred upon the class" and that a district court's assessment of "the value of the nonmonetary relief" will not be disturbed unless it is clearly erroneous and unsupported by the record. *See Poertner v. Gillette Co.*, 618 F. App'x 624, 629 (11th Cir. 2015).

In light of the foregoing, the requested Fee and Expense Award is reasonable.

## <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement and award Class Counsel the requested Fee and Expense Award.

Dated: March 23, 2020               Respectfully submitted,

                                    **WEBB, KLASE & LEMOND, LLC**

                                    */s/ E. Adam Webb*
                                    Adam Webb, GA Bar No. 7439410
                                    Matthew C. Klase, GA Bar No. 141903
                                    1900 The Exchange, S.E. Suite 480
                                    Atlanta, Georgia 30339
                                    Phone: (770) 444-0773
                                    Fax: (770) 217-9950
                                    Adam@WebbLLC.com
                                    Matt@WebbLLC.com

                                    **OF COUNSEL**

                                    **MONTEVERDE & ASSOCIATES PC**
                                    Juan E. Monteverde
                                    The Empire State Building
                                    350 Fifth Avenue, Suite 4405
                                    New York, NY 10118
                                    Tel.: (212) 971-1341
                                    Fax: (212) 202-7880
                                    Email: jmonteverde@monteverdelaw.com

                                    **LEVI & KORSINSKY, LLP**
                                    Donald J. Enright
                                    Elizabeth K. Tripodi
                                    1101 30th Street NW, Suite 115
                                    Washington, DC 20007
                                    Phone: (202) 524-4290
                                    Email: denright@zlk.com
                                           etripodi@zlk.com

                                    *Attorneys for Lead Plaintiffs*

26

## **TYPE AND FONT CERTIFICATION**

The undersigned certifies that this brief complies with Local Rule 5.1(B) regarding typefaces and fonts.

*/s/ E. Adam Webb*
E. Adam Webb

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of March, 2020, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

*/s/ E. Adam Webb*
E. Adam Webb

27